UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

J'ENTLE DAVIS, as administrator of the estate of
decedent Phyllis Harmon,

                                    DECISION AND ORDER

                          Plaintiff,
                                    14-CV-6562L

                v.


CITY OF ROCHESTER, et al.,

                          Defendants.

_____


        This action was brought by Phyllis Harmon in January 2018, asserting claims against the

City of Rochester ("City"), the Rochester Police Department ("RPD"), and RPD officers Brian

Marone and Joseph Reidy, pursuant to 42 U.S.C. § 1983.  In her *pro se* complaint, Harmon

alleged that the individual defendants falsely arrested her and used excessive force during the

arrest.

        On March 29, 2017, the Court issued a Decision and Order (Dkt. #27) granting in part

and denying in part defendants' motion for summary judgment.  *Harmon v. City of Rochester*,

2017 WL  1164404 (W.D.N.Y. Mar. 29, 2017).  The Court dismissed all the claims against the

City and the RPD, as well as the false-arrest claim against Marone and Reidy.  Harmon's claims

for excessive force and failure to protect were allowed to proceed.

        Attorney Michael Jos. Witmer appeared as retained counsel for Harmon in April 2018.

(Dkt. #52.)  On October 13, 2020, counsel for both sides filed a stipulation (Dkt. #105) to

substitute J'entle Davis as plaintiff, following Harmon's death in June 2020.  An order to that effect was duly entered.  (Dkt. #106.)

Following the Court's prior summary judgment decision and Witmer's appearance in the case, discovery continued, and is now closed.

Marone and Reidy have moved again for summary judgment dismissing the remaining claims against them.  (Dkt. #128.)  Plaintiff has filed a response in opposition to the motion. (Dkt. #130.)

The motion for entry of summary judgment in favor of the remaining defendants is granted and the complaint is dismissed.

## FACTUAL BACKGROUND

Much of the relevant factual background is set forth in the Court's 2017 decision, familiarity with which is assumed.  Some of the facts laid out here are also taken from defendants' Rule 56 Statement (Dkt. #128-1), which has not been contradicted by plaintiff, as explained later in this Decision and Order.

In brief, on Sunday morning, July 14, 2013, Officers Marone and Reidy were summoned to plaintiff's residence at 111 Atkinson Street in Rochester, in response to a 911 call.  Reidy arrived first, parked his vehicle in front of the house, got out and walked toward the house.

Harmon was standing outside the house, as was a man, Ulysses Betances.[1]  Betances explained to Reidy that he was a contractor and had been hired by Harmon to perform some lead

---

[1] Harmon testified that Betances's son was also present, but whether he was or not is immaterial to the motion before me, as there is no evidence that he was involved in the relevant events.

abatement work inside her house.  He had left some tools in the house, and went there that morning to retrieve them in advance of a job at a different site the next day, but Harmon would not let him in or give him his tools.  Harmon confirmed that she would not allow Betances into her home, stating that it would take "God himself" to do so.

During this conversation, Officer Marone arrived in his vehicle, parked and walked over. At some point, Harmon walked away, toward the street.  Betances showed the officers documentation from the City authorizing him to do lead abatement work in the house, and that he had a key to the house.  The officers told him that he could go in and get his tools, which were visible through a window.

As Betances was entering the house, Harmon came back and walked up the steps toward the door.  Marone stepped between Harmon and the door to prevent her from entering.

A physical altercation ensued.  Marone testified at his deposition that he put his arms up to block Harmon, and that she "like swatted my hand away and punched me in the chest."  (Def. Ex. F at 9. )  He stated that he was not injured, but "kind of shocked" that she would do that.  *Id.*

Marone testified that he told Harmon she was under arrest, and he and Reidy attempted to handcuff her.  Harmon physically resisted, and Marone warned her that if she did not cooperate, he would use pepper spray on her.  Harmon continued to struggle, and Marone applied a burst of pepper spray into her face.  She continued to resist, but the officers got her down onto the floor of the porch and were able to place handcuffs on her behind her back.

At the time of her death, Harmon had not been deposed in this action.  In November 2018, however, she was interviewed by two sergeants from the RPD Professional Standards Section ("PSS"), concerning these events.  She stated that after Betances entered the house,

Marone "barricaded" the door, and when she got down to peer inside, Marone got her in a headlock between his legs.  Eventually he released her and she fell backwards.  Harmon testified that she when got to her feet, Harmon falsely accused her of hitting him, lifted her up and shoved her against the door, pepper sprayed her, and slammed her to the floor of the porch.  Reidy joined in, repeatedly "smashing [her] head into the porch."  Eventually she was handcuffed and gotten to her feet. (Def. Ex. A at 12-22.)

When Harmon complained that she was having difficulty breathing (apparently because of the pepper spray), an ambulance was summoned, and she was taken to the Emergency Department at Strong Memorial Hospital in Rochester.  She was administered an eyewash for the pepper spray, and it was noted that she did not appear to have sustained any physical injuries.  A few hours later, she was released.[2]

## DISCUSSION

### I.  Plaintiff's Response to Defendant's Motion

In response to defendants' motion for summary judgment, plaintiff, through counsel, filed a nine-page "Opposition" (Dkt. #130), about half of which recites the factual and procedural history of the case, with the other half given over to legal argument.  Accompanying the Opposition are several exhibits:  a copy of this Court's prior summary judgment decision, a transcript of a May 23, 2017 status conference in this case, a transcript of Harmon's testimony before the PSS, and a transcript of a proceeding in Rochester City Court from an action that

---

[2] Apparently Harmon's stay at the hospital also included  a psychiatric evaluation, but she was found not to pose a danger to herself or others, or to need any psychiatric treatment.  *See* Def. Ex. K.

Harmon brought against Betances to recover the value of some items that she alleged he had stolen from her home.

Notably absent from plaintiff's filing is a response to defendants' Rule 56 Statement of material facts (Dkt. #128-1).  Rule 56(e) of the Federal Rules of Civil Procedure provides that if the non-moving party fails to respond to a summary judgment motion by setting forth "specific facts showing that there is a genuine issue for trial," then "summary judgment, if appropriate, shall be entered against the adverse party."  Local Rule 56 also provides that all material facts set forth in the movant's statement of material facts "will be deemed admitted unless controverted by the statement required to be served by the opposing party."

The Court has enforced that rule in a number of cases, usually in actions brought by *pro se* litigants.  *See*, *e.g.*, *Strong v. Gorman*, 310 F.Supp.3d 380, 382 (W.D.N.Y. 2018); *Swift v. Tweddell*, 582 F.Supp.2d 437, 441-42 (W.D.N.Y. 2008).  In *pro se* cases, out of an abundance of caution the Court routinely sends the *pro se* litigant a notice advising the litigant of the importance of responding properly to the summary judgment motion, and the consequences of not doing so.

In the case at bar, plaintiff is represented by counsel, who is presumed to be aware of the requirements of the Federal and Local Rules.  In response to defendants' motion, however, counsel has submitted only a short response that says little more than that the Court should reject defendants' motion out of hand, on the ground that defendants are attempting to relitigate matters that have already been decided by the Court.

Apparently counsel simply assumed that the Court would agree with that argument, and operating on that assumption, saw no point in including a responsive statement setting forth the

facts that are alleged to be in dispute, as required by the Local Rules.  As explained below, I do not agree with plaintiff's argument, and I will consider and decide defendants' motion on the merits.  Because plaintiff has not properly responded to defendants' Rule 56 Statement, the facts set forth in that statement, to the extent they are supported by the record, may thus be accepted as true by the Court in deciding the motion for summary judgment.  *See Rabell v. United States*, No. 13-cv-780, 2015 WL 2351915, at *1 n.1 (D.Conn. May 15, 2015) (stating that plaintiff, who was represented by counsel, failed to file a statement admitting or denying the specific facts set forth in the defendant's Rule 56 Statement, and that the court would therefore consider the facts contained in the defendant's statement to be undisputed for the purposes of the defendant's summary judgment motion); *Harry v. Pentagroup Financial, LLC*, 04 CV 4003, 2007 WL 812998, at *1 (E.D.N.Y. Mar. 14, 2007) (same).[3]

## II.  Defendants' Motion

### A.  Effect of the Court's Prior Summary Judgment Decision

In response to defendants' motion, plaintiff contends that defendants are attempting "to relitigate what has been the law of the case for five years, is res judicata and that which they are collaterally estopped from relitigating ... ."  (Dkt #130 at 5.)  Plaintiff states that if the Court does elect to "reconsider[]" its prior summary judgment decision, the Court should take into

---

[3] In opposition to defendants' first motion for summary judgment, Harmon did submit a *pro se* response to defendants' Rule 56 statement that they filed in conjunction with that motion.  (Dkt. #24-1.)  That response mostly concerns Harmon's dispute with Betances and her assertion that he had no right to enter her house on the day in question.  It only briefly touches upon the officers' use of force and certainly does not refute the specific statements in defendants' present Rule 56 statement, for which defendants have provided evidentiary support.

consideration the aforementioned exhibits, which plaintiff has submitted without any citation to any particular or relevant portions or explanation of how they bear upon the issues before me.  *Id.*

Contrary to plaintiff's argument, there is nothing improper about defendants' moving again for summary judgment, either as a general matter or under the circumstances of this case. A party may move for summary judgment "at any time," either "until 30 days after the close of all discovery" or as directed by the court.  *See* Fed. R. Civ. P. 56(b).  There is no rule that a party gets one and only one chance to seek summary judgment, and defendants' motion was both permitted and timely pursuant to the Court's most recent scheduling order, *see* Dkt. #127.  In addition, courts, including the Second Circuit, have held that the law of the case doctrine does not bar a district court from revisiting the issues in the case, to the extent that there has been further development of the factual record.  *See Cangemi v. United States*, 13 F.4th 115, 140 (2d Cir. 2021).

For example, in *Wysong v. City of Heath*, 260 F.App'x 848 (6th Cir. 2008), which also involved a claim of excessive force, the district court had previously denied the defendants' motion for summary judgment, and the Sixth Circuit affirmed.  After the case returned to the district court, the defendants took additional discovery and renewed their motion for summary judgment on the ground of qualified immunity.  The district court again denied the motion.  On interlocutory appeal, the Court of Appeals reversed, ruling that on the undisputed facts of the case as developed in discovery, it was clear that no constitutional violation occurred and that the officers were therefore entitled to summary judgment.  In so ruling, the court stated that the law of the case doctrine did not apply because "substantially new evidence ha[d] been introduced" as a result of the intervening period of discovery.  *Id.* at 852.  *See also Krueger Assocs., Inc. v. Am.*

*Dist. Tel. Co. of Pa.*, 247 F.3d 61, 65-66 (3d Cir. 2001) (district court appropriately considered post-discovery summary judgment motion despite having denied pre-discovery summary judgment motion); *Frankel v. Slotkin*, 984 F.2d 1328 (2d Cir. 1993) (affirming grant of defendants' renewed motion for summary judgment, which they filed subsequent to previously-denied motion and additional discovery).

I also reject plaintiff's assertion that defendants are asking the Court to "reconsider" its prior decision, or that the Court has previously intimated that issues concerning the officers' liability could not or would not be revisited until trial.  Plaintiff contends that "the May 23, 2017 [court] appearance implied that the only thing left was possible disclosures to avoid a motion in limine, assignment of counsel, and trial ... ."  (Dkt. #130 at 5.)  The transcript of that status conference (Dkt. #130-2), at which Harmon was still appearing *pro se*, shows that there was discussion about outstanding discovery and possible appointment of counsel (as well as the unreasonableness of Harmon's $20 million settlement demand), but there was never any suggestion made by any of the participants that once those loose ends were tied up, there would be nothing left to do in the case but proceed to trial.[4]

When Harmon's present counsel entered the case in April 2018, discovery was reopened. One might even say that at that point, it began in earnest.  At the Court's direction, attorney Witmer submitted a proposed discovery plan on August 3, 2018, proposing, *inter alia*, that

---

[4] Following that conference, Harmon filed a motion for appointment of counsel (Dkt. #30), which was denied (Dkt. #33) because of her failure to provide certain information (such as her monthly income) as directed by the Court.

Two attorneys from a firm in Long Island subsequently appeared as counsel for Harmon (Dkt. #38, #40), but after about two months filed a motion to withdraw, which was granted (Dkt. #44, #47, #48.)  Witmer thereafter entered his appearance, and has been plaintiff's attorney of record ever since.  (Yet another attorney briefly appeared as co-counsel for Harmon, but was terminated by stipulation of the parties, *see* Dkt. #69.)

non-expert fact discovery be completed by November 30, 2018.  (Dkt. #66.)  That included

document discovery and party depositions.  Those proposals were partly adopted in the Court's

subsequent scheduling order (Dkt. #68), which was amended some ten times thereafter to extend

the deadlines for completion of discovery and, significantly, for the filing of dispositive motions,

most recently on March 1, 2022.  (Dkt. #127.)  The notion that plaintiff has somehow been

blindsided by defendants' present motion, or that the parties never contemplated the filing of

such a motion, is flatly contradicted by the record in this case.

Nor did the Court's prior decision close the door to defendants' renewal of their motion at

some future date.  In denying the officers' motions on the excessive force claim, the Court stated,

"While plaintiff may have a steep hill to climb given the likely rapid succession of events that

transpired, summary judgment on plaintiff's excessive force and failure to protect claims would

be inappropriate *at this juncture*."  2017 WL 1164404, at *4 (emphasis added; internal quote and

alteration omitted).  That in no way precluded defendants from later renewing their motion, nor

did the Court indicate that the motion was denied with prejudice to refiling at some later date, if

warranted by further development of the factual record.

Finally, even if defendants' motion could be seen as asking the Court to "reconsider" its

prior summary judgment decision (which it is not, since it does not seek to alter or amend that

decision, but to obtain summary judgment based on a more complete record than before), that

would not be improper, on law of the case grounds or otherwise.  *See Cangemi*, 13 F.4th at 140

(finding that law of the case did not apply, since district court's decision did not directly conflict

with its prior decisions, but adding that "even if it could be said that the district court

reconsidered its [earlier] decisions ... on purely legal grounds, the law of the case doctrine is

'discretionary and does not limit a court's power to reconsider its own decision prior to final judgment'") (quoting *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992)).

### B.  Merits of Defendants' Motion

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party.  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

"The moving party bears the burden of showing the absence of a genuine dispute as to any material fact ... ."  *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014).  "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim."  *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009).  "In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Id.*

In the case at bar, defendants have easily met their initial burden.  They have submitted voluminous evidence, including excerpts of Marone's and Reidy's depositions and both their affidavits, photographs, and medical and police records.  They have also submitted a statement of

facts which they contend are not reasonably in dispute, which as stated has not been contradicted by plaintiff.

To recapitulate, defendants' evidence indicates that Marone and Reidy allowed Betances to enter Harmon's house for the sole purpose of retrieving his tools. When Harmon saw this, she verbally objected to Betances being inside her house, and she came up on the porch and headed toward the door, with the apparent intent of entering.

Marone, understandably thinking that it would be best for all concerned to keep Harmon and Betances physically separated, stood in front of the door to prevent Harmon from entering. When he put his hands up to block Harmon from going inside, she swatted his hand away and struck him in the chest.

At that point, Marone told Harmon that she was under arrest. When he and Reidy attempted to handcuff her, Harmon physically resisted. Marone warned her that if she did not stop resisting, he would use pepper spray. She did not, and he sprayed her in the face. Although that momentarily stopped her, she resumed struggling. The officers then got Harmon's arms behind her back, got her down to the floor of the porch, and were able to put handcuffs on her. After she complained that she was having difficulty breathing, because of the pepper spray, Harmon was taken by ambulance to a hospital, where she was treated with an eye wash, kept under observation for a brief period, and released.

With respect to the existence and extent of any injuries, in her complaint, her notice of claim filed with the City, and her *pro se* papers filed in opposition to defendants' prior summary judgment motion, Harmon alleged certain injuries and symptoms as a result of this incident, including bruises, swelling, and continuing pain and loss of mobility in her shoulders and arms.

In support of their present motion, defendants have submitted copies of Harmon's medical records, including workers compensation records and reports of treating physicians, which collectively indicate that Harmon suffered from or complained of many such symptoms since long before the July 14, 2013 incident.  *See* Def. Rule 56 Statement (Dkt. #128-1) Exs. L-T.  The records also show that when she was treated immediately after the incident, apart from the effects of the pepper spray such as eye irritation and difficulty breathing, Harmon did not complain of any physical injuries, nor were any observed by the reporting medical personnel.  *Id.* Exs. J, K.

Plaintiff has submitted only the thinnest response to defendants' evidence in this regard. Harmon's *pro se* opposition to defendants' prior summary judgment motion, *see* n. 2 *supra*, says little about the officers' use of force, and nothing about the detailed and specific evidence that defendants have submitted on their current motion.  As stated, her response to the present motion says virtually nothing about these matters, since plaintiff has taken the position that the Court should not even entertain the motion.

In her oral statements at the PSS interview, Harmon did relate what she claimed occurred on July 14.  As one might expect, her statement contradicted the defendant officers' accounts of those events in some respects.

As noted, however, to defeat a well-supported motion for summary judgment, "the nonmoving party must come forward with *admissible* evidence sufficient to raise a genuine issue of fact for trial ... ."  *Cordiano*, 575 F.3d at 204.  The question arises, then, whether Harmon's prior statement at the PSS interview is admissible in this action, and I conclude that it is not admissible.

As an out-of-court statement being offered for the truth the of the matters asserted,

Harmon's statement is unquestionably hearsay, *see* Fed. R. Evid. 801.  As such, it is inadmissible

unless it falls within an exception to the hearsay rule, *see* Fed. R. Evid. 802.

Rule 804(b)(1) permits the admission of prior sworn testimony of an unavailable witness,

but only if certain criteria are met:  (1) the testimony must have been given "at a trial, hearing, or

lawful deposition"; and (2) the testimony must be "offered against a party who had–or, in a civil

case, whose predecessor in interest had–an opportunity and similar motive to develop it by direct,

cross-, or redirect examination."  A motive to develop testimony is "sufficiently similar" for

purposes of Rule 804(b)(1) when the party now opposing the testimony would have had, at the

time the testimony was given, "an interest of substantially similar intensity to prove (or disprove)

the same side of a substantially similar issue" now before the court.  *United States v. DiNapoli*,

8 F.3d 909, 914-15 (2d Cir. 1993).  Harmon's statements do not qualify as an exception to the

hearsay rule.

Harmon is obviously unavailable to testify, *see* Fed. R. Evid. 804(a)(4) (a declarant is

unavailable to testify when she is "unable to be present ... at the hearing because of death").  It is

less obvious whether the PSS proceeding at which Harmon testified qualifies as a "hearing" for

purposes of the rule.  The Rules of Evidence do not state what constitutes a "hearing," and

although her statements were given under oath, *see* Dkt. #130-3 at 2, it appears that this

proceeding was more in the nature of an interview.

Even assuming *arguendo* that the PSS proceeding qualifies as a "hearing," however,

plaintiff has not shown that the individual defendants in this case had an opportunity to develop

Harmon's testimony through direct or cross-examination, or that their interests were represented

at that proceeding by any predecessor in interest.  Plaintiff has therefore failed to establish the admissibility of Harmon's testimony.  *See United States v. Robbins*, 197 F.3d 829, 838 (7th Cir. 1999) (proponent of out-of-court statement bears burden of proving it falls within hearsay exception); *United States v. Menlowitz*, No. S2 17 Cr. 248, 2019 WL 6977120, at *9 (S.D.N.Y. Dec. 20, 2019) ("The proponent of a hearsay statement bears the burden of demonstrating its admissibility").

It appears from the transcript that the only persons present at the proceeding were Harmon, two PSS sergeants, and four "advocates," who appear to have been non-lawyer individuals who were friends of Harmon who attended at Harmon's request, presumably to observe and offer her some type of moral support.  The advocates' only recorded participation in the proceeding came while Harmon was testifying about how the officers held her down and handcuffed her.  It appears that Harmon may have been getting visibly emotional at this point in her testimony, because one of the advocates asked her if she wanted to take a break, and another said, "Take a break, hon.  Take a break.  ... Come on, this is me."  Tr. at 18.

Thus, neither Marone, Reidy, nor any predecessor in interest of theirs was present at the proceeding.  The fact that the interview was conducted by two RPD sergeants is not enough to show either that they were defendants' predecessors in interest or that their motives in examining the witness were similar to what defendants' would have been.

The sergeants were presumably there to conduct an impartial interview and to hear Harmon's side of the story, not to cast doubts on her account, question her credibility, or act as representatives for Marone and Reidy.  That much is evident from their questions, which were entirely limited to asking what happened on July 14, and occasionally to clarify particular aspects

of Harmon's statements.  Nothing about their questions was adversarial in nature, or suggested

that they considered Harmon to be a hostile witness or an opponent.  *See Colon v. Porliar*,

09-CV-1006, 2012 WL 3241466, at *2 (N.D.N.Y. Aug. 7, 2012) (finding testimony from a

disciplinary hearing not admissible under any exception to the hearsay rule because the

defendants themselves were not present and had no opportunity to question the witnesses at that

hearing, and plaintiff failed to show that the hearing officer was defendants' predecessor in

interest).

  In addition, the PSS sergeants were not particularly concerned with developing Harmon's

testimony relating to her alleged injuries.  For example, when Harmon stated, "Officer Reidy

kept smashing my head into the porch just with his hand," the interviewing sergeant replied,

"Okay.  And then what happened?"  Tr. at 19.  The entire focus of the interview was simply what

Harmon said "happened," not the reasonableness of the officers' actions, the degree of force they

used, or the existence or extent of her injuries.  *See Ricciuti v. N.Y.C. Transit Auth.*, No. 90 CIV.

2823, 1998 WL 171469, at *4 (S.D.N.Y. Apr. 14, 1998) (finding that prior testimony from a 50-h

examination was inadmissible in federal lawsuit, and stating that "a 50-h examination is

preliminary and investigatory, without the particular circumstances that drive and inform an

adversary proceeding").

  The requirement that the party against whom the prior testimony is sought to be admitted

had an opportunity to develop it "is generally satisfied when the defense [was] given a full and

fair opportunity to probe and expose [the] infirmities [of the testimony] through

cross-examination."  *United States v. Carneglia*, 256 F.R.D. 366, 372 (E.D.N.Y. 2009) (quoting

*United States v. Salim*, 855 F.2d 944, 954 (2d Cir.1988)).  That clearly did not occur here, since the defendants in this case were not present or represented at Harmon's interview.

Harmon's statement before the PSS is therefore inadmissible against them in this lawsuit. *See Bowling v. Nolette*, No. 18-CV-597, 2021 WL 4134733, at *6 (N.D.N.Y. Sept. 10, 2021) ("Because Plaintiff has not proven that any of the Defendants were present at or had their interests represented by counsel at the Section 50-h examination, and because he has not proven (or even argued) that [the party that was present] was a predecessor-in-interest to the individual ... Defendants, he has not proven that Defendants had an opportunity to develop testimony on any issue at the Section 50-h examination sufficient to enable that testimony to be considered").

The only other account of the underlying events is the testimony of a non-party witness, Linda Rollins, who was identified and produced by plaintiff's counsel as an eyewitness.  At her deposition, Rollins testified that she went to Harmon's house on the morning of July 14 because she and Harmon were both involved in a neighborhood garage sale.  She stated that she saw defendants "manhandling" Harmon and that they had Harmon in a choke hold.  Def. Ex. I at 25, 30.

Defendants contend that the undisputed facts demonstrate that Rollins could not possibly have witnessed the interaction between Harmon and the officers.  In support of that assertion, they have submitted copies of photographs from Google Maps, which are consistent with Harmon's testimony about the physical layout of her house.[5]  The gist of defendants' argument is

---

[5] Courts have taken judicial notice of such evidence, particularly where, as here, its accuracy has not been called into question.  *See, e.g.*, *Hernandez v. Caliber Bodyworks LLC*, No. 21-cv-5836, 2022 WL 1002450, at *4 (N.D.Cal. Apr. 4, 2022) (taking judicial notice of Google Maps Street View images of property where relevant events occurred); *United States v. Nettles*, No. 18 CR 1007, 2021 WL 3131658, at *5 n.9 (E.D.Mo. June 7, 2021) ("The undersigned may take judicial notice of historical map information located in Google Maps").

-16-

that based on Rollins's testimony about where she was at the time (near the curb on the west side of Harmon's house), it would have been physically impossible for her to have seen what was happening between Harmon and the officers, who were on a porch on the east side of the house.

Based on that evidence and Rollins's testimony about where she was and what she saw, it does seem that she could not have seen the initial confrontation between Harmon and the officers, which occurred just outside the door of Harmon's house. Even assuming that Rollins witnessed some of the relevant events, however, her testimony was so vague and incomplete that it does not give rise to any genuine issues of fact. Rollins stated that she did not recall if the participants were in front of the house, or whether they were on the porch. *Id.* at 25. Nor did she remember if anyone else was present. *Id.* at 28. When asked if she could see the door of the house from where she was, she answered, "You have to go up the steps." *Id.* at 28. If anything can be inferred from that non-responsive answer, it is that she could not see the door, because she had *not* gone up the steps. What is clear is that Rollins did not see what precipitated the physical encounter between Harmon and the officers. In short, Rollins's testimony does not give rise to an issue of fact about whether the officers used excessive force against Harmon.

That leaves the officers' testimony and affidavits, as well as the documentary evidence, *i.e.* the arrest reports and medical evidence. That evidence indicates that when Harmon–who had made clear that it would take "God himself" to let Betances into her home–saw that Betances was inside, she made straight for the door. The officers had already made the decision to allow Betances to enter the house for the sole purpose of picking up his tools.

The officers' accounts need not be repeated in detail here, but they show that Harmon initiated the physical contact by swatting away Marone's hands and striking him in the chest.

-17-

Marone made no claim that he was injured, and said that he was more surprised than anything at what Harmon had done, but clearly at that point he had probable cause to arrest her, as this Court has already found.  2017 WL 1164404, at *2.  The evidence further shows that Harmon refused to comply with the officers' directives, and that she physically resisted their attempts to place her in handcuffs, despite their warning that she would be pepper-sprayed if she did not stop resisting.

Although on the prior summary judgment motion the Court found that there were fact issues concerning the reasonableness of the force used, that was based on a sparser record than that now before me.  The admissible evidence of record shows that Marone used a reasonable amount of force to take Harmon down to the porch floor, and that he used a "hooking" technique, as he had been taught to do, to get her down and get her arms behind her back so that she could be handcuffed.

As noted earlier, the evidence also shows that at no time during these events, when the ambulance arrived, or after she was taken to the hospital (which was in response to her complaints about the effect of the pepper spray) did Harmon complain of the injuries she later claimed in this lawsuit to have suffered as a result of defendants' actions.  The record further shows that the symptoms of which she later complained were all consistent with health and physical conditions and problems that had been reported and diagnosed years before this incident.

In response to defendants' motion, plaintiff argues, correctly, that she need not prove that Harmon suffered some objectively identifiable physical injury in order to establish an excessive-force claim.  The point, however, is that this evidence is inconsistent with Harmon's allegations about what happened.  As noted in the Court's prior decision, Harmon said that at the

-18-

time of the incident, "she was 5 feet tall, 117 pounds and 54 years of age, while the defendant officers were significantly younger, bigger and/or stronger."  2017 WL 1164404, at *4.  In his report following the incident, Marone listed his height and weight as 6'2" and 185 pounds. Marone Decl. (Dkt. #128-3) Ex. A.  It strains credulity to think that had he and Reidy treated Harmon as roughly as she alleged (including lifting her up, pushing her against a door hard enough to break a pane of glass, and body-slamming her onto the floor), she would not have complained afterwards about pain or injury, or displayed any signs of injury, apart from the temporary effects of the pepper spray.  Particularly in the absence of any countervailing admissible evidence, that further undermines the strength of plaintiff's proof.  *See Falls v. Pitt*, No. 16-CV-8863, 2021 WL 1164185, at *15 (S.D.N.Y. Mar. 26, 2021) (stating that where "by Plaintiff's own admission, he suffered minor, momentary pain and no injuries from the officers' alleged beating, ... no reasonable trier of fact could determine that [the defendants] used excessive force when arresting Plaintiff") (internal quote and citation omitted); *Ferebee v. City of New York*, No. 15-CV-1868, at *8 (S.D.N.Y. July 6, 2017) (noting that when plaintiff went to the hospital following his arrest, the only pain of which he complained was attributable to a pre-existing hernia, that there was "no report of any pain in his shoulders or parts of the body that would be affected by [the defendant officer's] lifting of his arms" as alleged by plaintiff, and stating that "because the evidence shows no pain or injury related to the arrest, Plaintiff's excessive force claim fails as a matter of law").

I also agree with defendants that even if there were evidence that the force used by the officers was excessive, they would be entitled to qualified immunity.  The doctrine of qualified immunity "shields government officials from civil damages liability unless the official violated a

statutory or constitutional right that was clearly established at the time of the challenged

conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). "Defendants moving for summary

judgment on the basis of qualified immunity bear the burden of 'demonstrating that no rational

jury could conclude (1) that the official violated a statutory or constitutional right, and (2) that

the right was clearly established at the time of the challenged conduct.'" *Vasquez v. Maloney*,

990 F.3d 232, 238 (quoting *Coollick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012)) (additional

internal quote omitted).

The Supreme Court "ha[s] repeatedly told courts not to define clearly established law at

too high a level of generality." *City of Tahlequah v. Bond*, __ U.S. __, 142 S.Ct. 9, 11 (2021)

(citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). Identifying the right in question with

specificity "is 'especially important in the Fourth Amendment context,' where it is 'sometimes

difficult for an officer to determine how the relevant legal doctrine, here excessive force, will

apply to the factual situation the officer confronts.'" *Id.* at 11-12 (quoting *Mullenix v. Luna*, 577

U.S. 7, 12 (2015) (per curiam)). *See also Rivas-Villegas v. Cortesluna*, __ U.S. __, 142 S.Ct. 4,

8 (2021) (where it was not "obvious" that the force used by an officer was excessive, "to show a

violation of clearly established law, [plaintiff] must identify a case that put [the officer] on notice

that his specific conduct was unlawful"); *City of Escondido v. Emmons*, __ U.S. __, 139 S.Ct.

500, 504 (2019) ("[W]e have stressed the need to identify a case where an officer acting under

similar circumstances was held to have violated the Fourth Amendment") (per curiam) (citing

*District of Columbia v. Wesby*, 583 U.S. __, 138 S.Ct. 577, 581 (2018)).

In the case at bar, it is of course possible that defendants used somewhat more force than

absolutely necessary. But the Fourth Amendment does not require officers to use the least

possible degree of force.  *See Mael v. Howard*, No. 18-CV-378, 2022 WL 263235, at *5

(W.D.N.Y.  Jan. 27, 2022) ("Less forceful means may have been available to [defendant], but an

officer is not held to such a standard"); *Brennan v. City of Middletown*, No. 18 Civ. 6148, 2020

WL 3820195, at *7 (S.D.N.Y. July 8, 2020) ("The police are not required to utilize the least

amount of force possible to place someone into custody").  What is required, to establish

defendants' liability, is proof that the force they used was objectively unreasonable, in light of the

circumstances known to them.  *Lennon v. Miller*, 66 F.3d 416, 425-26 (2d Cir. 1995); *Baker v.

City of New York*, 551 F.Supp.3d 258, 266 (S.D.N.Y. 2021).

Based on the admissible evidence before the Court, which shows that Marone and Reidy

got Harmon onto the porch floor and handcuffed her only after she struck Marone in the chest

and physically resisted the officers' attempts to take her into custody, and that she suffered no

physical injuries as a result, I conclude that even if plaintiff could succeed in showing that

defendants' actions amounted to a constitutional violation, plaintiff has failed to meet her burden

of showing that such a violation was clearly established.  Defendants are therefore entitled to

qualified immunity.  *See Style v. Mackey*, No. 20-2165, 2021 WL 5022657, at *1 (2d Cir. Oct.

29, 2021) (defendants were entitled to qualified immunity on excessive-force claim where

plaintiff had "not brought to [the court's] attention any cases of controlling authority" or "a

consensus of cases of persuasive authority such that," at the time of his arrest, "a reasonable

officer could not have believed that [the defendants'] actions were lawful") (quoting *Wilson v.

Layne*, 526 U.S. 603, 617 (1999)).

Finally, since there is no basis for plaintiff's claim of excessive force, there likewise can

be no claim based a failure to intervene.  *See Pierre v. City of New York*, 860 F.App'x 14, 16 (2d

Cir. 2021) ("because Pierre has not established that he suffered any constitutional injury, he cannot sustain his claim[ ] for ... failure to intervene").[6]

Finally, although not germane to the motion for summary judgment, it is clear that this case is not able to be prosecuted and is going nowhere. The original plaintiff, Harmon, is deceased. She was never deposed. There can be no evidence presented from her and there are no witnesses to the event to support plaintiff's allegations.

The administrator of Harmon's estate has been substituted as a party plaintiff but there does not appear to be any admissible evidence to support the claims of excessive force. The evidence deemed inadmissible on the summary judgment motion would, of course, likewise be inadmissible at trial. It appears that a trial order of dismissal would be inevitable.

## CONCLUSION

Defendants' motion for summary judgment (Dkt. #128) is granted, and the complaint is dismissed.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
October 12, 2022.

---

[6] In my 2017 decision, the Court alluded to the possibility that the complaint might be read to assert a claim of unlawful entry. *See* 2017 WL 1164404, at *1 n.1. Plaintiff's response to the present motion for summary judgment makes no mention of such a claim, however, and I deem any such claim waived and dismissed.